Bissell and others, Executors, Respondents, vs. Tax Commission, Appellant.

*March 15—April 9, 1940.*

For the appellant there was a brief by the *Attorney General* and *Harold H. Persons,* assistant attorney general, and oral argument by *Mr. Persons.*

For the respondents there was a brief by *Lecher, Michael, Whyte & Spohn* of Milwaukee, and *Louis A. Pradt, Jr.,* of Wausau, and oral argument by *George D. Spohn.*

FAIRCHILD, J. The respondent taxpayer (the estate of Walter H. Bissell, deceased) was surety for the Bissell Lumber Company to the First Wisconsin National Bank of Milwaukee. Bissell in his lifetime was an officer and stockholder of the lumber company. In order to enable that company to borrow money, Bissell and his son F. K. Bissell on May 21, 1931, guaranteed payment to the First Wisconsin National Bank of any indebtedness then existing or thereafter to be incurred by the lumber company to the extent of $150,000. F. K. Bissell was also an officer of the company, but the father's resources and interests were primarily involved. The guaranty so signed was for a period of three years. In 1933, however, upon the request of the bank, W. H. Bissell signed a pledge agreement by which he pledged securities to support the guaranty. These securities so pledged were sold under advantageous circumstances after Mr. Bissell's death at a price which was considerable of an increase over the appraised value at which the estate held the property, so that a profit of $123,299.65 was realized.

In 1935, exercising the rights of subrogation to the bank's claim against the lumber company, the taxpayer took over the available assets of the lumber company and realized therefrom the sum of $20,127.44. *Hamill v. Kuchler,* 203 Wis. 414, 232 N. W. 877, 234 N. W. 879; *Estate of Bienenstok,* 208 Wis. 676, 242 N. W. 572. Upon payment of the company liabilities of $134,283.31 a loss to the taxpayer of $114,155.87 resulted. There can be no serious dispute as to the existence of a loss and the elements going to make up that loss. But the state claims that it was not definitely ascertainable and identifiable in the year 1935, and that matters were not definitely concluded until sometime after January 1, 1936, and consequently the loss is not to be deducted from the income in 1935.

The tax commission asserts that because of the existence of a claim of contribution against F. K. Bissell and because of the acquired rights against W. W. Gamble and F. K.

Bissell as makers of notes on which the lumber company was indorser, the loss could not in fact be a definitely ascertainable loss in that year, even if it were apparent to the taxpayer that some loss was bound to be sustained. In disposing of these contentions it must be recognized that deductible losses under the statutes regulating tax on incomes must be established by closed transactions. *Ewing Thomas Converting Co. v. McCaughn* (3d Cir.), 43 Fed. (2d) 503. There is no serious controversy over the principles of law, and the question is: Was there any possibility of recoupment of any part of this loss after the close of the year 1935? *W. H. Dail, Jr., v. Commissioner of Internal Revenue,* 19 B. T. A. 1036; *United States v. Anderson,* 269 U. S. 422, 46 Sup. Ct. 131, 70 L. Ed. 347; *American National Co. v. United States,* 274 U. S. 99, 47 Sup. Ct. 520, 71 L. Ed. 946; *Lucas v. American Code Co.* 280 U. S. 445, 50 Sup. Ct. 202, 74 L. Ed. 538.

As far as the W. W. Gamble and F. K. Bissell notes are concerned, they were listed as assumed liabilities, but were also credited to the lumber company as being assets transferred to the executors. As pointed out in the court below they were what the accountants style "in and out" transactions and did not affect the end figure at all. At the end of 1935 these notes were not assets of the Bissell Lumber Company, and whatever transactions were had later with respect to these notes do not affect or postpone the final closing out and sale of the Bissell Lumber Company in 1935. The taxpayer did not acquire rights in and to those notes until after the year 1935, and the fact that they were paid later than 1935 has no bearing upon the fact which is clearly established that the Bissell Lumber Company had completely disposed of its assets in the year 1935. Rights acquired by the taxpayer against the lumber company and upon which it realized to the extent stated in 1935 are separate and distinct from the rights which the taxpayer acquired when it

paid the Gamble and Bissell notes. The estate at the end of 1935 had no right to proceed against either of the makers of the notes, for the notes were then the property of the First Wisconsin National Bank.

The rights against the Bissell Lumber Company to which the taxpayer succeeded in 1935, stated in dollars and cents, are as follows: The taxpayer paid for the benefit of the lumber company $134,283.31. It received from the lumber company its assets amounting to $38,777.44, but subject to liabilities of the company amounting to $18,650, thus leaving net assets to the taxpayer of $20,127.44. This produces a net loss of $114,155.87, which is the difference between the debts of $134,283.31, and the assets of $20,127.44. The assets so received were cash and notes. This transaction was not rendered incomplete simply because property was taken in exchange for the debt. *State ex rel. Howe v. Lee,* 172 Wis. 381, 178 N. W. 471. At the close of 1935 the taxpayer had all the assets of the lumber company. At that time all the property of the lumber company had been disposed of by transactions which were closed in 1935.

It is claimed by the respondent that the right of contribution of the taxpayer against F. K. Bissell was valueless; and that this was known and demonstrable before the close of the year 1935. It is of course conceded that F. K. Bissell signed the guaranty to the bank and that ordinarily under that circumstance the guarantor who pays would have a right of contribution against his coguarantor for one half of the amount of his payment. *Estate of Koch,* 148 Wis. 548, 134 N. W. 663.

The taxpayer was confronted with these facts: The guaranty was limited to three years from May 21, 1931; the three years expired before the bank had sold any of the taxpayer's property; the bank did not proceed against the guarantors or on the guaranty, but against the taxpayer on the pledge of security given individually by W. H. Bissell; and

the bank indorsed the notes that were paid over to the tax-payer. But if all legal questions arising out of the facts just enumerated are considered of no consequence, the evidence of the lack of value of the right of contribution would determine there was a loss. There was no effort to collect from F. K. Bissell, but the taxpayer offered evidence to show that any proceedings against him for that purpose would be a waste of time and money. The court below found the taxpayer warranted in concluding, after investigation as to the financial ability of F. K. Bissell to pay, that "he had practically nothing with which to make good his share of the guaranty" and in its memorandum opinion the court observed that "an ordinary prudent and conservative business man would charge such claim off as a loss."

The interchange between F. K. Bissell and his father as disclosed by the evidence left the taxpayer in a situation where the executors were amply justified in concluding that there could be no recoupment for moneys advanced by the senior Bissell. The suggestion that F. K. Bissell was an heir and would inherit from the Bissell estate does not carry uncertainty as to the final factors. The interest in the estate was thoroughly understood as well as its limitation and it appears there was nothing there from which to recoup the taxpayer's losses. The taxpayer was still liable on the F. K. Bissell note of $10,000 held by the First Wisconsin National Bank, and his note for $3,000 to the Fond du Lac National Bank in addition to other indebtedness to the taxpayer. But in any event, the estate is the taxable entity and the income to be determined is the income of the estate. Assets could not be brought into the estate by suing an heir for what the heir might take out of it. There might be an increase in the portion which would go to other heirs but the weighing of the earning of the estate against the loss suffered by it must be made by measuring the assets coming into the estate against the cost to the estate of realizing the earning.

The trial court found that amounts were not in dispute as to their mathematical correctness. Upon the subject of a loss evidenced by closed and completed transactions, fixed by identifiable events and actually sustained in 1935, the trial court said: "The trustees [operators of the lumber company] disposed of all the assets of the corporation before the end of 1935 and the executors knew at the end of such year what they would realize and what the estate's loss would be." The evidence sustains that finding. While deductible losses under income tax statutes must be established by closed transactions and cannot be shifted according to the desires and interests of the taxpayer, it is also true that when a corporation has disposed of all of its assets in payment of its debts within a given year and ceases to transact business, the stock of the corporation becomes valueless in that year. *Humble & Gulf Coast Oil Co. v. Commissioner of Internal Revenue,* 5 B. T. A. 328; *Jessie S. Meachem v. Commissioner of Internal Revenue,* 22 B. T. A. 1091; *Pick v. Tax Comm.* 225 Wis. 102, 273 N. W. 537. Deductions for losses must be shown by an identifiable event. *United States v. S. S. White Dental Co.* 274 U. S. 398, 47 Sup. Ct. 598, 71 L. Ed. 1120.

The fact that corporate rights and privileges were not formally forfeited at the moment does not shift or extend the period. The facts which determine that a loss had actually occurred in 1935 are not overthrown or modified by a later meeting of the people who had been interested in the company and the adoption of resolutions recognizing the sale of the assets of the company and proceeding to authorize the formal dissolution thereof. In this case it appeared that the meeting of stockholders in 1936 with reference to the winding up of the lumber company was for the purpose of satisfying one of the trustees' demand that there be documentary evidence that the trustees had completed their labor and were relieved of their responsibility. The

fact remains that the lumber company was wound up before the close of the year 1935.

There were no transactions affecting the property of the lumber company after December 31, 1935, and the taxpayer accounted for all that came to it under its right of subrogation to the debts formerly owed to the bank, and was left with a net unrecoverable loss of $114,115.87.

*By the Court.*—Judgment affirmed.